UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROSENDO SALGADO,

Defendant.

Case No. 3:13-cr-00056-LRH-VPC

ORDER

Rosendo Salgado moves to vacate, set aside, or correct his sentence. ECF No. 95. The government opposed the motion, and Salgado filed a reply. ECF Nos. 99, 118. The court now denies the motion, finding Salgado's claim for ineffective assistance of counsel is meritless and finding Salgado's remaining claims are procedurally barred.

## I. BACKGROUND

A federal grand jury indicted Salgado, on three counts: (1) conspiracy to possess methamphetamine with the intent to distribute in violation of 21 U.S.C. § 841 and § 846; (2) conspiring to launder money in violation of 18 U.S.C. § 1956; and (3) illegal use of a communication facility in violation of 21 U.S.C. § 843. ECF No. 4. Salgado took the matter to trial, which lasted four days. ECF Nos. 66, 68–70. He was represented by attorney Dennis Cameron. ECF No. 33; *see also* ECF Nos. 66, 68–70.

At trial, Sparks Police Officer Bryan Orr testified first. Transcript of Jury Trial ("Tr.") at 11. Orr worked as a task force officer with the Drug Enforcement Administration ("DEA") and served as a case agent on the Salgado investigation. Tr. at 12–15, 21. As a case agent, Orr

1

reviewed the local law enforcement's prior investigation. Tr. at 15. He then ordered a controlled purchase of methamphetamine from the drug-trafficking organization. Tr. at 16–17. After the purchase was complete, Orr applied for pen registers[1] and ping orders[2] for telephone numbers associated with the seller. Tr. at 18–19. He did so in an effort to identify other members of the drug-trafficking organization. Tr. at 18–19. Orr later applied for a state wiretap[3] after "[exhausting] all other means of investigation [techniques]." Tr. at 19–20.

The wiretap began in January 2013, and was conducted by third-party employees contracted by the DEA. Tr. at 21. The monitoring occurred in Las Vegas, Nevada. Tr. at 21. The monitors were instructed to "only monitor criminal calls." Tr at 21. They were also instructed to contact a case agent if a pertinent call was intercepted. Tr. at 21.

In an attempt to monitor only pertinent calls, the monitors listened to intercepted calls for a limited time period. Tr. at 21. If the monitors did not find the call to be pertinent within the limited time period, they stopped listening to the call. Tr. at 21. But the monitors periodically checked the phone line to ensure that criminal activity was not being discussed. Tr. at 23. Orr testified that the minimization techniques were usually explained to the monitors by a government attorney while Orr was present, during which time the monitors review a minimization letter. Tr. at 23–24, 67. Defense counsel objected to the testimony regarding the monitors' training and conduct, but his objection was overruled. Tr. at 23.

Orr later applied for additional wiretaps for other phone numbers associated with the drug-trafficking organization. Tr. at 57. He testified that the monitors took the same precautions to minimize the intercepted calls. Tr. at 57. Federal wiretaps were eventually obtained for phone numbers being used in California. Tr. at 58, 60. The investigation resulted in an estimated 5,000 to 6,000 intercepted calls. Tr. at 89. Orr also testified that the calls consisted of conversations relating to the drug-trafficking operation. Tr. at 31–37, 405–409, 415–423, 425–428, 455–457.

---

[1] Orr testified that a pen register shows the time a call is made, the number to which the call is made, and the duration of the call. Tr. at 13.
[2] Orr testified that a ping order operates as a GPS tool to determine the location of cell phone when pinged. Tr. at 13, 25, 51.
[3] The state wiretap authorized the wiretapping of phone number that the confidential informant called to set up the controlled purchase. Tr. at 19–20.

In addition to the above investigative steps, Orr conducted in-person surveillance of Salgado when Salgado was in Reno. Tr. at 38–45. The content of the intercepted calls, the ping orders, and the in-person surveillance led Orr to believe that Salgado lived in California but traveled to Reno for purposes related to the drug-trafficking operation.[4] Tr. at 31–56. Orr testified that he associated Salgado with a phone number subject to the federal wiretap by using ping orders. Tr. at 59. He also linked Salgado to the cars used in the drug-trafficking organization by way of GPS data, surveillance, and registration searches. Tr. at 408–410.

On cross-examination, defense counsel attempted to discredit Orr and undermine Orr's investigation in multiple ways. ECF No. 62–88, 93–94. He first took issue with an intercepted call, in which the conversation did not suggest criminal activity until ten pages into the transcription of the call (which counsel represented to be four minutes). Tr. at 82–83. In reference to the limited time in which monitors must determine if a call is pertinent, Orr stated that he "could not testify to exactly how monitors minimize" the calls. Tr. at 83. But Orr knew the time limit could be expanded if the monitors knew the speakers were individuals "having drug contact." Tr. at 83. The speakers on the call were Salgado and a coconspirator. Tr. at 83.

Counsel also attempted to discredit the investigation by demonstrating that the language used on the intercepted calls could be innocent in nature; the speakers did not mention drugs or drug trafficking. Tr. at 73–84. But Orr explained that his training and the context in which the words were used allowed him to conclude that the speakers were using coded words for the purpose of drug trafficking. Tr. at 73–84, 438–439, 454–455.

Counsel next faulted Orr for failing to determine the identities of a coconspirators, including one nicknamed Chepe. Tr. at 85, 436–437, 442–443.

Finally, counsel emphasized that Orr neither witnessed Salgado pass drugs or drug-related money nor heard Salgado explicitly speak about the drug-trafficking operation. Tr. at 87–88, 435–437.

///

---

[4] Orr specifically testified to a trip made in January 2013. Tr. at 37. Pings showed a cell phone, which was usually located in Southern California, traveling to Reno, Nevada. Tr. at 37.

After Orr testified, the government called Jose Antonio Rangel—Salgado's cousin. Tr. at 103, 136. Rangel was previously convicted in state court for his involvement in the drug-trafficking operation. Tr. at 157, 228–230. When interviewed by law enforcement after his arrest, Rangel stated that Salgado was involved in the drug-trafficking operation as a leader. Tr. at 143–144, 148–149, 169–170, 174–175, 179. Rangel later recanted his statement at trial, testifying that he implicated Salgado based on his belief that Salgado had implicated him first. Tr. at 143–144, 148–150, 152–154, 156–158. But, also at trial, Rangel confirmed that he recognized Salgado's voice on the intercepted calls played for him during his post-arrest interviews. Tr. at 180–181, 245. Defense counsel attempted to give Rangel's trial testimony more effect, emphasizing that Rangel was under oath at trial but was not under oath when he gave his previous statements to law enforcement. Tr. at 223–226.

Detective George Carranza from the Reno Police Department testified next. Tr. at 183. During the Salgado investigation, Carranza worked as a case agent and was often assigned to the wire room because he was fluent in Spanish. Tr. at 185. Carranza listened to the pertinent calls and then shared the pertinent information with other officers that were working on the investigation. Tr. at 185–186.

Carranza also helped obtain the voice exemplar from Salgado, which he testified to be a true and accurate recording of Salgado's voice. Tr. at 187–188. He then identified Salgado's voice in the wiretapped calls by comparing the speakers' voices to the voice exemplar. Tr. at 190–193. He specifically identified Salgado as the speaker on a wiretapped call that was discussing the transfer of money. Tr. at 195–197.

As part of his duties as a case agent, Carranza also assisted with in-person surveillance and interviews. Tr. at 193–195, 198–200. He testified that he used the GPS information from the ping orders to assist with the in-person surveillance. Tr. at 193–194. The information led him to a location at which Salgado was observed. Tr. at 194

Carranza also conducted the post-arrest interview of Rangel and authored the corresponding report detailing Rangel's initial statements to law enforcement. Tr. at 199–200. During the post-arrest interview, Rangel implicated Salgado (and other individuals) during the

4

post-arrest interview and described Salgado as a "boss figure" within the drug-trafficking organization. Tr. at 201–205, 243. Carranza also testified that Rangel did not recant his statements regarding Salgado despite having multiple opportunities to do so prior to trial.[5] Tr. at 202–215, 243.

With Carranza on the stand, defense counsel attempted to challenge the investigation again. Tr. at 221–242, 246–247. He emphasized that Carranza obtained the prior statements from Rangel while Rangel was not under oath. Tr. at 225. He underscored Carranza's lack of training in voice identification and the lack of technology used to compare the voice exemplar to the wiretapped conversations. Tr. at 233–235. He also highlighted pieces of information on which the case agents were mistaken during the course of the investigation, *e.g.* the identity of a coconspirator by the nickname Pariente, as well as pieces of information that the case agents never resolved, *e.g.* the identity of a coconspirator by the nickname Chepe. Tr. at 235–241.

Hamilton Ruiz testified after Carranza. Tr. at 248. Ruiz worked for the Joint Language Training Center, which translates and transcribes materials for federal, state, and local entities. Tr. at 248–249. Ruiz worked as a linguist on the Salgado investigation, translating and transcribing the wiretapped calls. Tr. at 249, 252. He also listened to the voice exemplar obtained from Salgado and identified Salgado as a speaker on the wiretapped calls by comparing the voice exemplar to the speakers' voices. Tr. at 255–256. Defense counsel objected to the admittance of the transcripts translated by the Joint Language Training Center, ultimately arguing that the label "Chepe" was inappropriate. Tr. at 255, 263. His objection was overruled. Tr. at 263.

The government then called Blaine Beard. Tr. at 264. Beard, an employee of the Washoe County Sheriff's Office, worked as a task force officer for the DEA during the Salgado investigation. Tr. at 265–266. Beard described the ping orders and the in-person surveillance previously discussed by Orr. Tr. at 269–271. Beard explained that the DEA identified Salgado as a participant in the drug-trafficking operation through the ping orders and the in-person

---

[5] Rangel made other changes—but did not alter his implication of Salgado in the drug-trafficking organization or description of him as a "boss." He did recant the participation of other coconspirators, which further implicated Salgado. Tr. at 214–218.

surveillances. Tr. at 272–273. The identification of Salgado and his telephone number helped Beard to apply for the federal wiretap on the first out-of-state phone number. 274–275, 277. Beard then used toll records[6] to identify the sixteen telephone numbers used by the drug-trafficking organization, two of which were linked to Salgado. Tr. at 267–268, 278. He later explained that the wiretaps helped confirm Salgado's participation in the drug-trafficking operation. Tr. at 290–299.

Like Orr, Beard also testified about the minimization techniques used during the wiretapping process. Tr. at 287–289. He explained that the Assistant United States Attorney meets with each individual that monitors wiretapped calls or communication to review minimization techniques. Tr. at 287. He then explained that the most important pertinent calls, but not all of the pertinent calls, are given to the Joint Language Training Center for transcription and translation services. Tr. at 289. According to Beard, the in-person surveillance, the wiretapped calls, and the nature of the eight-month investigation helped the case agents identify which calls involved drug-related conversations and which calls were the most pertinent to Salgado's case. Tr. at 307–319.

Beard also testified that the conspirators used code words when discussing the drug-trafficking organization. Tr. at 320–321. And Beard eventually executed the search warrant executed at Rangel's residence in Reno, which resulted in the discovery of methamphetamine. Tr. at 459–465. He also initiated Salgado's arrest by contacting and working with law enforcement in California. Tr. at 465–470.

On cross-examination, defense counsel attacked the investigation again. Tr. at 301–310, 321-322, 324-326. He clarified that Beard did not see Salgado handle drugs or hear Salgado discuss the drug-trafficking operation during the in-person surveillance. Tr. at 301–302, 478. He also highlighted areas in the investigation in which Beard failed to personally pursue. Tr. at 303–310, 321–323, 476–477.

///

---

[6] Toll records detail the incoming and outgoing calls for telephone lines. Tr. at 277, 281–282. The toll records allowed Beard to identify the sixteen phones used by the conspirators. Tr. at 277.

6

Ibelise Polson, a Spanish-to-English translator and monitor for Metlang, testified next. Tr. at 327–328. As a monitor, Polson created synopses of the wiretapped calls in the Salgado investigation. Tr. at 327, 329–331. Like Ruiz, Polson used the voice exemplar obtained from Salgado and compared it to the wiretapped calls. Tr. at 331–332. She also identified Salgado as a speaker on the calls. Tr. at 332.

Polson explained that the monitors generated synopses of pertinent calls. Tr. at 336–352. She further explained that code words were used, which were often identified by their out-of-place nature in the context of the conversations. Tr. at 342, 357–359, 368–372.

After describing the synopses generated by her and her coworkers, Polson described the minimization techniques used by the monitors. Tr. at 389–401. She testified that the monitors received instruction on minimization techniques, which prohibited certain conversations from being monitored, *e.g.* a call with a lawyer. Tr. at 399–400. The monitors also received a copy of the affidavit that supported the wiretap application, which Polson reviewed. Tr. at 401, 403. Polson then explained that the case agents share basic information they know about the "targets," including the target's location and the target's phone number. Tr. at 390, 400–401. The case agents also share specific wording to listen for when monitoring the calls. Tr. at 390. Polson testified that she communicated with Orr when working on the Salgado investigation, both before and after the wiretaps began. Tr. at 390, 393.

Defense counsel objected to some of Polson's testimony, arguing the synopses should not be admitted because the entire calls were not transcribed and the calls were not transcribed by a law enforcement officer. Tr. at 335–336. His objection was overruled. Tr. at 337. However, he successfully prevented the admission of a synopsis on the ground of irrelevance. Tr. at 313, 376. On cross-examination, he questioned whether: (1) the synopses were accurate, (2) Polson had personal knowledge on the information she provided, and (3) Polson had training to determine if or when the speakers were using code in their calls. Tr. at 378–389.

Three additional witnesses testified towards the end of the trial. Edward Kovacs, a forensic scientist for the DEA, confirmed the substance recovered during the execution of the search warrant was methamphetamine. Tr. at 481–493.

Jacob Riedell, a detective for the Montclair Police Department in California, testified after Kovacs. Tr. at 493–508. Riedell recounted how he worked with Beard and assisted in the arrest of Salgado. Tr. at 495–500. Riedell explained how he confirmed Salgado's identity at the time of arrest and confirmed Salgado possessed a cell phone associated with the wiretapped phone number previously linked to Salgado. Tr. at 498–501. On cross, defense counsel clarified that Riedell did not find drugs or large amounts of money on Salgado's person or in the house from which Salgado exited before his arrest. Tr. at 504–507.

Sean Hall, a special agent with the DEA, testified last. Tr. at 512–576. Hall testified as an expert witness, providing the jury with an overview on how drug-trafficking organizations operate. Tr. at 512–576. Defense counsel questioned Hall on the typical duties of a case agent, which include making requests for fingerprint analyses and determining if a financial investigation into bank transfers was merited, Tr. at 551–556. He also discussed the use of coded language with Hall, eliciting testimony that decoding the language is not a precise science. Tr. at 559–563, 566–570.

Defense counsel used his closing argument to attack the sufficiency of the investigation again. Tr. at 635–663. He emphasized the agents' need to speculate regarding the coded language, Tr. at 637; he emphasized the agents' failure to follow leads on wire transfers and financial accounts, Tr. at 639–640, 647–650; he emphasized that the agents could not provide any eye-witness evidence of Salgado handling drugs, Tr. at 641; he emphasized the possibility of inaccuracies in the translated transcripts, Tr. at 641–643, 648–650; he emphasized the possibility that the allegedly coded language was actually innocent in meaning, Tr. at 642–645; he emphasized the detectives' failure to identity Chepe and other coconspirators, Tr. at 646–648; and he emphasized Rangel's trial testimony—and his duty to testify truthfully under oath—that Salgado was not involved in the drug-trafficking organization, Tr. at 651–663.

After the four-day trial, the jury convicted Salgado of conspiracy to possess methamphetamine with the intent to distribute in violation of 21 U.S.C. § 841 and § 846, of conspiring to launder money in violation of 18 U.S.C. § 1956, and of illegal use of a communication facility in violation of 21 U.S.C. § 841. ECF No. 75. Salgado was then sentenced

to a 235-month term of imprisonment and a 48-month concurrent term of imprisonment. ECF No. 81.

Salgado appealed his conviction and his sentence. ECF No. 82. The Ninth Circuit affirmed both and made the following findings: (1) sufficient evidence supported Salgado's conviction; (2) the court did not plainly err by admitting evidence of drug transactions in which Salgado was not directly involved; (3) the court did not err by overruling Salgado's hearsay objection regarding the drug transactions in which he was not directly involved; (4) the court did not plainly err by admitting law enforcement testimony about drug jargon in the form of a lay-witness capacity and an expert-witness capacity; (5) the admission of Salgado's coconspirators' statements did not violate the Confrontation Clause; and (6) the court did not clearly err in finding that Salgado was a leader and an organizer of the conspiracy. ECF No. 91.

Salgado now moves to vacate, set aside, or correct his sentence, alleging ineffective assistance of counsel, a Fourth Amendment violation, and an inappropriate sentencing enhancement based on a Fourth Amendment violation. ECF No. 95. The government opposes the motion. ECF No. 99.

## II. LEGAL STANDARD

A prisoner may move the court to vacate, set aside, or correct a sentence if "the sentence was imposed in violation of the Constitution or laws of the United States, or . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

## III. DISCUSSION

Salgado asserts the following claims for relief: (1) ineffective assistance of counsel, (2) a Fourth Amendment violation, and (3) an erroneous sentencing enhancement based on evidence collected in violation of the Fourth Amendment. The government argues that Salgado did not receive ineffective assistance from his counsel. The government also argues that the second and the third claims are procedurally barred. Because the claim for ineffective assistance of counsel potentially affects the court's decision on the remaining claims, the court first addresses the

merits of the ineffective-assistance-of-counsel claim and then the parties' arguments regarding the procedural-default rule.

**A. Ineffective Assistance of Counsel**

A petitioner may properly bring a claim for ineffective assistance of counsel in a § 2255 motion. *See United States v. Pirro*, 104 F.3d 297, 299 (citing *United States v. Miskinis*, 966 F.2d 1263, 1269 (9th Cir. 1992)). In order to prevail on an ineffective assistance of counsel claim, the petitioner has the burden of proving two elements. *Strickland v. Washington*, 466 U.S. 668, 684 (1984). "First, the defendant must show that counsel's performance was deficient," meaning that counsel was not functioning as a competent advocate. *Id*. at 687. The performance must fall "below an objective standard of reasonableness." *Id.* at 88. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Salgado argues that his counsel failed to provide constitutionally-adequate assistance of counsel in three ways. The court addresses each argument in turn.

*1. Motion to Suppress the Intercepted Calls*

Salgado first argues that his counsel failed to provide constitutionally-adequate representation by failing to move to suppress the intercepted calls based on the government's alleged failure to minimize the interception of calls unrelated to the criminal investigation.

Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, law enforcement may conduct electronic surveillance—including conducting wiretaps—if certain safeguards are met. 18 U.S.C. §§ 2510–2520. The minimization safeguard requires the government to minimize the interception of conversations that are not relevant to the criminal investigation. 18 U.S.C. § 2518(5) (requiring that wiretapping "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception [under Title III]."). But the minimization measures need to be reasonable; they do not need to be optimal.

*United States v. Rivera*, 527 F.3d 891, 904 (9th Cir. 2008) (quoting *United States v. McGuire*, 307 F.3d 1192, 1196 (9th Cir. 2002)). Because minimization requires reasonableness, the facts and circumstances of a case determines whether law enforcement satisfied the minimization safeguard. *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 140 (1978)). "[M]ore extensive surveillance may be justified" under certain circumstances, *e.g.* an investigation into "a widespread conspiracy." *Scott v. United States*, 436 U.S. 128, 140 (1978). Additionally, law enforcement "may account for the fact that unlawful conspiracies do not always lay bare their plans in explicit words and that the players in the conspiracy may use secret code in communicating[.]" *United States v. Fernandez*, 526 F.3d 1247 (9th Cir. 2008) (internal quotation marks omitted).

The testimony elicited at trial shows that the monitors received minimization instructions and that reasonable minimization techniques were used. Three witnesses testified about the minimization instructions and techniques. Orr testified first. He explained that the monitors were instructed to "only monitor criminal calls." He also explained that the monitors had a limited time to determine whether a call contained criminal discussions. He stated that the monitor's timeframe to determine if a call was pertinent depended on whether the speakers were known coconspirators. He also testified that the monitors review a minimization letter with a government attorney. Defense counsel attempted to exclude Orr's testimony regarding the minimization techniques, but his objection was overruled.

Beard also provided testimony on the topic of minimization. He testified that an Assistant United States Attorney reviews minimization techniques with each monitor. The minimization meeting includes instructions on which calls may be monitored and the duration for monitoring.

Polson was the last witness to testify about the minimization instructions and techniques. She worked as a monitor on the investigation. As a monitor, Polson explained that she received instruction on minimization techniques during a minimization meeting. She also testified that she understood that minimization prevented the monitoring of certain calls, *e.g.* calls with an attorney. Polson stated that the monitors received a copy of the affidavit supporting the wiretap application, which she reviewed.

Salgado provides no factual allegations—that are not conclusory in nature—to rebut the testimony that a minimization meeting occurred, monitors were instructed on minimization techniques, and minimization techniques were used during the investigation. Salgado instead quotes partial testimony to conclude that the monitors did not receive minimization instructions.[7] But, when the testimony is viewed in its entirety, it supports the witnesses' testimony that monitors were instructed on minimization techniques and minimization techniques were used.

Salgado also argues that the number of calls monitored during the course of the investigation prove minimization techniques were not used. But Salgado fails to argue why the number of calls violate minimization requirement; he does not explain why 5,000 to 6,000 intercepted calls would be unreasonable given the eight-month investigation into several conspirators with sixteen different phone lines. *See Scott v. United States*, 436 U.S. at 140 (stating conspiracies may justify more extensive monitoring).

The evidence at trial regarding the minimization instructions and techniques indicate the minimization was reasonable under the circumstances of this case. Salgado provides only conclusory arguments to the contrary. As a result, the court finds defense counsel's performance did not fall below the objective standard of reasonableness set forth in *Strickland* when he failed to move to suppress the intercepted calls. *James v. Borg*, 24 F.3d 20, 27 ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel."). The court therefore dismisses this basis of Salgado's claim for ineffective assistance of counsel.

---

[7] Salgado contends that Orr testified he was unaware of the type of training received by the monitors. ECF No. 118 at 3–4. However, to do so, Salgado takes part of Orr's testimony out of context. *Compare id.* with Tr. at 67. The complete testimony is as follows:

    Cameron:    Okay. And if I understand correctly, please correct me if I'm mistaken, you contract with a company down in Las Vegas and they actually monitor the wire for you.
    Orr:    Yes, sir.
    Cameron:    Okay. And are these law enforcement personnel?
    Orr:    No, sir.
    Cameron:    They are contract personnel.
    Orr:    Yes, sir.
    Cameron:    And do you have any idea what training they have received?
    Orr:    I have no idea, sir.
    Cameron:    Okay. So you don't know whether they have received training on minimization, correct?
    Orr:    I know as far as we talked–spoke earlier, that the attorneys do call them on the phone, we do talk to the monitors about minimization. They go through the minimization letter.

Tr. at 67.

### 2. *Phone Company Records*

Salgado next argues that his defense counsel failed to provide constitutionally-adequate assistance of counsel by failing to subpoena records from the phone company in an effort to prove Salgado's location and the location of the cellular phones at the time of the intercepted calls. But Orr, Carranza, and Beard all testified to the use of ping orders to access GPS information on the wiretapped phone lines. The GPS information recovered through the ping orders coincided with in-person surveillance conducted by law enforcement. Accordingly, even if counsel should have subpoenaed the company records, the failure to do so did not cause prejudice to Salgado. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (the failure to take a futile action does not constitute ineffective assistance of counsel). The court dismisses this basis of Salgado's claim as a result.

### 3. *Voice-Comparison Witness*

Salgado finally argues that defense counsel failed to provide constitutionally-adequate assistance of counsel because he did not call an investigator to testify on the issue of voice comparison. The court disagrees.

Four witnesses compared the voice exemplar from Salgado to the voices on the intercepted calls: Carranza, Ruiz, Polson, and Rangel. All four witnesses identified one of the speakers as Salgado. Rangel, Salgado's cousin, confirmed the voice identification at trial. Even more, the jury was provided with—and heard at trial—the voice exemplar and the recordings of the intercepted calls.[8] The court therefore finds that even if counsel should have retained a voice-comparison expert, Salgado has failed to establish prejudice based on the testimony at trial from multiple witness—including a family member. *See Rupe v. Wood*, 93 F.3d at 1445 (the failure to take a futile action does not constitute ineffective assistance of counsel).

The court denies this basis of Salgado's claim for ineffective assistance of counsel for a second reason: Salgado does not contend that the expert witness would have testified in a manner

---

[8] The court also notes that defense counsel attempted to undermine the accuracy of the witnesses' identification of Salgado's voice on cross-examination. He highlighted the officers' failure to use technology when comparing the voice exemplar to the recorded phone calls. He also underscored the witnesses' lack of training in voice recognition. *But see United States v. Torres*, 908 F.2d 1417, 1425 (9th Cir. 1990) ("Testimony of voice recognition constitutes sufficient authentication.").

that would have established reasonable doubt in his conviction. *See United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1989) (denying a claim for ineffective assistance of counsel when the petitioner failed to identify what the witness would have testified to and how the testimony would have changed the outcome of the case). Salgado merely faults his counsel for failing to call an expert witness, which is insufficient. The court therefore denies Salgado's claim for ineffective assistance of counsel.

### B. Procedurally Barred Claims

The court now considers if Salgado's remaining claims are procedurally barred. The procedural-default rule bars a petitioner from raising claims on collateral review that were not raised on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003). But a petitioner may overcome the procedural-default rule by showing either (1) cause and prejudice to explain the default or (2) actually innocence of the charged crime. *United States v. Guess*, 203 F.3d 1143, 1145 (9th Cir. 2000).

To establish cause, a petitioner "must show that 'some objective factor external to the defense' impeded his adherence to the [procedural-default rule]." *United States v. Skurdal*, 341 F.3d 921, 925 (9th Cir. 2003). A petitioner establishes cause "if the record shows that an appellate counsel's performance fell below the [*Strickland v. Washington* standard]." *Id.* (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To establish prejudice, "the petitioner must show 'not merely that the errors at … trial created a *possibility* of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions'". *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (quoting *United States v.* Frady, 456 U.S. 152, 170 (1982) (emphasis in original)).

The procedural-default rule bars Salgado's remaining claims because Salgado does not establish cause, prejudice, or actual innocence to excuse his failure to raise the claims on direct appeal. Salgado relied on his claim for ineffective assistance of counsel to establish cause and prejudice. However, the court denied the claim above. Accordingly, the court denies the remaining claims under the procedural-default rule.

///

## C. EVIDENTIARY HEARING

A court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the [petitioner] is entitled to no relief." 28 U.S.C. § 2255(b); *see also Shah v. United States*, 878 F.2d 1156 (9th Cir. 1989) (holding an evidentiary hearing was not necessary because the district court judge could give the petitioner's allegations "careful consideration and plenary processing" based on the transcripts from the case, the judge's own recollections of the proceedings, and the petitioner's motion). Further, "[m]ere conclusory allegations do not warrant an evidentiary hearing." *Id.* at 1161.

The court declines to hold an evidentiary hearing because the testimony at trial conclusively shows that Salgado is not entitled to relief. Multiple witnesses testified to the minimization procedures taken during the wiretapping operations; multiple witnesses testified to the locations of the cell phones during intercepted calls, which were identified through a ping procedure; and, multiple witnesses testified to the identification of Salgado's voice on the intercepted calls. Salgado provides no factual assertions that cause the court to question the accuracy of the testimony or cause the court concern as to his claims for ineffective assistance of counsel. The court therefore declines to hold an evidentiary hearing.

## D. CERTIFICATE OF APPEALABILITY

The rules governing 28 U.S.C. § 2255 proceedings require a district court to issue or deny a certificate of appealability when entering a final order adverse to the applicant. 28 U.S.C. § 2255 Governing Rule 11(a). A petitioner must receive a certificate of appealability in order to proceed with an appeal. 28 U.S.C. § 2253(c)(1). To receive a certificate of appealability, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must show "that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Salgado fails to make a substantial showing of the denial of a constitutional right in his petition. No reasonable jurist would find that the court's denial of Salgado's petition is debatable

or that Salgado's claims were adequate to deserve a certificate of appealability. The court therefore denies Salgado a certificate of appealability.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Rosendo Salgado's motion to vacate, set aside, or correct his sentence (ECF No. 95) is **DENIED with prejudice**.

IT IS FURTHER ORDERED that Rosendo Salgado is denied a certificate of appealability.

IT IS SO ORDERED.

DATED this 7th day of February, 2018.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE